LAURA COUCH,
Plaintiff

vs

Case No. 1:08-cv-300
(Beckwith, J.; Hogan, M.J.)

COMMISSIONER OF
SOCIAL SECURITY,
Defendant

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of Errors (Doc. 9) and the Commissioner's response in opposition. (Doc. 10).

## PROCEDURAL BACKGROUND

Plaintiff was 39 years old at the time of the ALJ's decision. Plaintiff has a Bachelor's degree and past relevant work as a tax preparer. Plaintiff filed an application for DIB on February 11, 2004, alleging disability since July 16, 1996, due to retractable migraine headaches. Her insured status expired on September 30, 1998. Plaintiff's application was denied initially and upon reconsideration. Plaintiff then requested and was granted a de novo hearing before an administrative law judge (ALJ). Plaintiff, who was represented by counsel, appeared at a

hearing before ALJ Ronald Jordan at which a Vocational Expert (VE) appeared and testified.

On May 4, 2006, the ALJ issued a decision denying plaintiff's DIB application. The ALJ noted that because plaintiff's insured status lapsed on September 30, 1998, the issue was whether she was disabled on or prior to that date. (Tr. 18). The ALJ determined that plaintiff's migraine headaches constituted a severe impairment as of July 1, 1996, her alleged onset date, but that her headaches did not meet or equal the Listing of Impairments. (Tr. 20). According to the ALJ, plaintiff retained the residual functional capacity (RFC) for a full range of work, except that she could not lift more than 20 pounds occasionally and 10 pounds frequently. She could sit, stand, and walk for six hours each in an eight-hour workday, but was not able to work in direct sunlight or in an environment of strong odors or excessive dust, fumes, or gases. (Tr. 22). The ALJ determined that plaintiff's allegations regarding her limitations were only partially credible. (Tr. 22). The ALJ determined that plaintiff could perform her past relevant work on or prior to September 30, 1998, her date last insured, and therefore was not disabled. (Tr. 22). The Appeals Council denied plaintiff's request for review, making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a

2

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal

3

those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

4

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed

5

above. *Felisky*, 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan,* 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. 1990) (unpublished), 1990 WL 94. Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for

6

failure to present evidence at the prior administrative hearing. *Faucher,* 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan,* 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services,* 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher,* 17 F.3d at 176. *See also Felisky v. Bowen,* 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

Plaintiff sought treatment for chronic headaches in July 1992 from neurologist Dr. Rajan. (Tr. 105). She related a fifteen year history of headaches, which over the past two months had become more severe. (Tr. 107). Plaintiff told Dr. Rajan her headaches occurred at least once a day and lasted for several hours, and that she experienced scintillating scotoma in front of her eyes and associated dizziness. (Tr. 107). Dr. Rajan diagnosed migraine headaches, prescribed Inderal and Pamelor, and recommended a CT scan, which was unremarkable. (Tr. 108, 110).

In August 1992, plaintiff reported that her headaches were "better" although she still got them "once in a while." (Tr. 106). Plaintiff denied any side-effects from the medication. Dr. Rajan increased plaintiff's dose of Inderal and prescribed Fiorinal III on an as needed basis. (Tr. 106).

Plaintiff continued to treat with Dr. Rajan throughout 1993 and 1994. Dr. Rajan's office notes for 1993 and 1994 show the severity of plaintiff's headaches fluctuated and that she was

7

given DHE-45 injections for her headaches, in addition to Fiorinal, Pamelor, and Inderal. (Tr. 111-115). In January 1994, plaintiff told Dr. Rajan that her headaches were much better and that she wanted to discontinue her migraine medications in an effort to become pregnant. (Tr. 115).

Kathy Alter, M.D., a primary care physician, treated plaintiff in October 1993 at which time she diagnosed depression, TMJ, and migraines. (Tr. 117-18).

In March 1996, plaintiff was referred to the Drake Headache Center and evaluated by Vincent Martin, M.D., for her recurring headaches. (Tr. 529, 534). Plaintiff stated that her headaches were increasing in frequency, occurring one to two times a week, and lasting between four hours to three days. (Tr. 522, 534). She reported she experienced three types of headaches: migraine, tension, and sinus. (Tr. 522, 534). She described the migraine headaches as throbbing, with associated phonophobia and photophobia. (Tr. 534). The headaches were accompanied by nausea and dizziness at times. (Tr. 522, 534). These headaches were incapacitating and caused her to cry and have to lie down. (Tr. 534). She experienced these headaches about twice a month and they lasted from 1 to 4 days. (Tr. 522, 534). She had a second type of headache, a tension headache, that lasted about 2 hours and occurred 2 to 3 times per day. (Tr. 534). They were "annoying" but not incapacitating. (Tr. 534). The third type of headache, a sinus headache, was similar to the second, but included congestion. (Tr. 534). Plaintiff indicated that she had tried Inderal, Pamelor, and Imitrex, but these medications did not improve her headaches. (Tr. 534). Midrin, Fiorinal, and Fioricet tended to help the headaches, but did not relieve them. (Tr. 534). Dr. Martin diagnosed headaches and stated that plaintiff's severe headaches would meet the diagnostic criteria for migraine without aura. (Tr. 535). Her less severe headaches were consistent with either sinogenic or rhinogenic headaches. (Tr. 535). Dr. Martin ordered a CAT

8

scan of plaintiff's sinuses, discussed the migraine diet with plaintiff, asked her to keep a food diary and migraine log, started her on Calan, Phrenilin Forte, and Anaprox, and advised her to decrease her consumption of other over the counter analgesics. (Tr. 535). She was to follow up in one month. (Tr. 535).

In accordance with Dr. Martin's instructions, plaintiff maintained a monthly headache log from March 1996 through September 1997. (Tr. 474-89). Plaintiff documented the severity of her headaches each day of the month. She assigned a rating of her headaches for the morning, evening, and night on a scale of one to four: 0 being no headache; 1 being slight headache; 2 being moderate headache; 3 being severe headache; and 4 being very severe headache. *Id.*

A psychological evaluation dated April 9, 1996 revealed a pain disorder associated with both psychological factors and a general medical condition. (Tr. 537-38). Dr. Keslo, the examining psychologist, recommended that plaintiff be encouraged to pursue more active and adaptive coping strategies such as relaxation. (Tr. 538). Plaintiff underwent five biofeedback therapy sessions with Dr. Kelso over the next several months. (Tr. 541-543, 544).

Plaintiff was treated for her migraine headaches on a monthly basis by Dr. Martin from March 1996 through October 1997. (Tr. 534-567). His monthly treatment notes show the severity of plaintiff's headaches fluctuated as well as her response to the various treatment modalities utilized, but that she still experienced daily headaches. In April 1996, her headaches were unchanged. Dr. Martin suspected rhinogenic headaches contributed to her headache pattern and added Desipramine and Imitrex to her medication regimen. (Tr. 540). In May 1996, he reported that plaintiff continued to have daily headaches, which appeared to be a combination of migraine and tension-type headaches. Dr. Martin increased the dosage of Desipramine and

9

prescribed Corgard in addition to the Fiorinal. (Tr. 544). In June 1996, Dr. Martin reported that plaintiff's migraine headaches "appear to be somewhat improved in terms of decreased severity" but that plaintiff experienced "both tension type as well as sinogenic headaches which accompany these migraines leading to daily headaches." (Tr. 545). Dr. Martin also suspected plaintiff's headaches worsened by fluctuations in estrogen and prescribed a trial of birth control pills. Dr. Martin added Lo-Estrin and Tylenol #3 to plaintiff's medication regimen, increased the dosage of Desipramine, and continued Fiorinal. *Id.*

Plaintiff was seen for an "emergency visit" on August 16, 1996 by Robert Smith, M.D., a colleague of Dr. Martin's at the Drake Center, Inc. Headache Clinic. (Tr. 546). Dr. Smith reported that plaintiff's headaches had been much better while on Lo-Estrin except during the time she was on the placebo. He reported, "She had very severe headaches this cycle. She restarted her birth control pills five days ago and her headaches have not lessened. She has had no response to Tylenol #3 or Fiorinal. Yesterday her headache was very severe. Today, her headache is at a level II, down from III to IV." (Tr. 546). Dr. Smith also noted that plaintiff was attending "headache school." *Id.* When plaintiff saw Dr. Martin three days later, he reported that while her migraine headaches appeared to "dramatically improve" with estrogen, her headaches did not resolve when the estrogen birth control pill was restarted after her most recent cessation. (Tr. 547). Dr. Martin increased the dosage of estrogen and omitted the placebo week every other month. He also added Rhinocort sprays for nasal symptoms and Percocet for pain. (Tr. 547, 548).

In November 1996, plaintiff reported her headaches "dramatically improved, at least a 50% decrease in severity with the institution of the higher dose of LoEstrin." (Tr. 550). In

10

December 1996, Dr. Martin reported that plaintiff appeared to be doing "reasonably well" with her migraine headaches, but was still experiencing four or five migraines per month. (Tr. 554). However, plaintiff stated the migraines were less intense and tended to be relieved with medication. (Tr. 554). She also reported that her time between Imitrex injections was improved on the hormonal therapy. *Id.* Dr. Martin also suspected that plaintiff was having a component of rhinogenic headaches since she seemed to be having some sinus-related headaches and a lot of nasal congestion. Dr. Martin prescribed Rhinocort and Claritin-D. (Tr. 554). Plaintiff also complained of bright red blood in the rectum, and Dr. Martin recommended plaintiff see a gastroenterologist. (Tr. 554).

In late December 1996, plaintiff was examined by Kim Jurell, M.D., for the occurrence of rectal bleeding. (Tr. 555-56). She was to be scheduled for a flexible sigmoidoscopy to rule out ulcerative colitis versus an anorectal source of blood loss. (Tr. 556). The next record of a follow up with Dr. Jurrell is in September 1999, when plaintiff saw Dr. Jurrell for abdominal pain and reflux-like symptoms. (Tr. 571).

In January 1997, Dr. Martin reported that plaintiff's migraine headaches were "dramatically worse since we decreased the birth control pill." (Tr. 560). Dr. Martin noted that plaintiff had started sulfasalazine in January for inflammatory bowel disease and could not "absolutely rule out the fact that the sulfasalazine could be contributing to the headaches." *Id.* Dr. Martin increased her dosage of Lo-Estrin and added Prozac to her medication regimen. (Tr. 560).

At a follow up on May 2, 1997, plaintiff indicated that she had been doing "extremely well during the months of February and March" until she stopped the birth control pill to have a

11

menstrual period. (Tr. 562). Since then, plaintiff reported having had about 6 or 8 migraine headaches. (Tr. 562). Dr. Martin suspected the worsening of her migraine headaches was due to a combination of estrogen withdrawal and allergic symptoms from pollen. Dr. Martin attempted to "break her headache cycle" by prescribing Prednisone and Percocet. He continued Imitrex and prescribed nasal drops for the affected side of the headache. (Tr. 562). On May 16, 1997, plaintiff indicated "slight" improvement in her headaches. (Tr. 564). Dr. Martin ordered a refill of plaintiff's prescriptions in May and August 1997. In October 1997, Dr. Martin reported that plaintiff had a molar pregnancy[1] when she went off birth control pills and that her headaches were "terrible" when she first developed the molar pregnancy. Plaintiff stated she had been having about five migraine headaches per month and nasal symptoms. (Tr. 567). Dr. Martin assessed that overall plaintiff's migraine headaches "have been doing reasonably well in the last month." *Id.* He continued the prescription for Vancenase since he believed there was a component of rhinogenic headache. *Id.* He also prescribed Zyrtec and Phenergan for nausea. *Id.*

In December 1997, Dr. Martin prescribed a TENS unit for treatment of plaintiff's chronic knee pain. (Tr. 568). The record contains no medical records showing treatment after December 1997 until November 1998 when plaintiff was examined by Dr. Alter. Dr. Alter noted an improvement in plaintiff's mood, increasing headaches, and stomach cramps. (Tr. 119).

Plaintiff continued to receive treatment for migraine headaches after this time, but since her insured status lapsed in September 1998, those records are not reviewed here.

---

[1]"A molar pregnancy is a noncancerous (benign) tumor that develops in the uterus" whereby "the placenta develops into a fast-growing mass of cysts (hydatidiform mole)." http://www.mayoclinic.com/health/molar-pregnancy/AN00938.

**OPINION**

This case centers on plaintiff's credibility. The VE testified that if plaintiff missed two or more days of work per month because of her migraine headaches, she would be unemployable. (Tr. 604). Thus, whether plaintiff was disabled depends on the whether her testimony on the frequency and severity of her headaches credibly establishes she would miss two or more days of work per month prior to September 30, 1998, her date last insured. The ALJ determined that plaintiff was partially, but not fully credible with respect to the degree of her limitations prior to September 30, 1998. (Tr. 20). Plaintiff challenges this finding, asserting it is without substantial support in the record. For the reasons that follow, the Court agrees and recommends that this matter be reversed and remanded for further proceedings.

**Plaintiff's testimony**

Plaintiff testified that she started experiencing headaches in college, and she started seeking aggressive therapy for them at the end of the 1980s. (Tr. 584). She attended "headache school" and was treated by Dr. Martin. (Tr. 584). Plaintiff stated that she did not know what caused her headaches; that was why she had gone from doctor to doctor. (Tr. 589). She testified, "Some of the doctors say they have to get me on the right preventative, no one can figure it out and I've been doing this for almost 15 years." *Id.* Plaintiff stated that in the early 1990s, she experienced one or two headaches per week, but then they gradually worsened. (Tr. 589). She stated that her headaches had worsened after giving birth to three children. (Tr. 590). She knew of some triggers, such as the odor of raw onions, perfume, and bright sunlight, but the majority of the time, she woke up with a headache in the middle of the night. (Tr. 590).

Plaintiff testified that she experienced different types of headaches. (Tr. 592). The most

13

severe, which plaintiff described as migraine headaches, consisted of a throbbing pain in the side of her head: "It's on one side of the temple. It's about the size of a nickel and it feels like an ice pick has been stabbed in the side of your head. It's a throbbing pain and very sensitive to light, very sensitive to sound and very sensitive to smells. You just want to curl up in a dark room and shut everybody out. A lot of times you throw up." (Tr. 592). She testified that she had this type of headache several times a month and they could last for a number hours up to several days. (Tr. 593, 594). Most of the time, they would last more than a day. (Tr. 593). Plaintiff testified could not function at all when she had these types of headaches. (Tr. 593). She stated that when she had these headaches, she would likely have to miss two days of work. (Tr. 593). Plaintiff testified when she experienced this type of migraine, she would not be able to work or take care of her children, but "would lay in bed." (Tr. 593).

Plaintiff also experienced what she described as tension headaches (Tr. 594). She testified these headaches were a "little less severe" and that she usually would not throw up with them. However, she still experienced light and sound sensitivity. (Tr. 594-595). She experienced these types of headaches on a daily basis and they would come and go without warning. Plaintiff testified it was difficult to concentrate with these headaches. (Tr. 595). Plaintiff had to lie down to relieve the pressure. (Tr. 595).

Plaintiff testified that Dr. Martin had tried different medications for her headaches. At times, the frequency or duration of the headaches would decrease and she would have better days. (Tr. 596). However, eventually the headaches would return to the baseline level. (Tr. 597).

Plaintiff testified that her migraine headaches had been increasing in frequency to the point where she had migraines four to five times per week. (Tr. 597). She began treating with

14

Dr. Mannix in February 2003, when the frequency of her headaches increased. (Tr. 343, 597).
Plaintiff stated that Dr. Mannix had been able to reduce the frequency of her headaches back to
three or four days per week. (Tr. 597). When she experienced the headaches and had to lie down,
she was usually bedridden the whole day and into the next day. (Tr. 597). Plaintiff testified she
did not experience the tension headaches as often and that currently, when she did not have a
migraine, she did not have any type of headache. (Tr. 598). However, her migraine headaches
were worse and when she had two or three in a week she could be in bed the entire week. (Tr.
599).

## The ALJ's credibility determination

The ALJ determined that plaintiff "was partially, but not fully, credible with respect to the
degree of limitation imposed by her headaches on and prior to September 30, 1998, the date she
was last insured." The ALJ reasoned:

> The medical records for that time period show that her headaches were generally
> diminishing in severity in 1996 and 1997, and that she did not require any medical
> treatment in 1998 until two months after her last insured date. The claimant's
> headaches apparently worsened considerably in 2001 after she began treatment for
> Chron's disease. (Exhibit 3F, 4F). It is understandable that the claimant now has
> a poor memory with respect to the severity of her headache condition eight or
> more years ago as compared to how bad it has been over the last five to seven
> years. Given the faultiness of human memory compared to the relative accuracy
> of written medical documentation, great reliance is placed on the objective
> medical record to determine the claimant's level of functioning as of September
> 30, 1998. The claimant's testimony is accepted to the extent that it was in
> agreement with this medical documentation, and that it was consistent with the
> residual functional capacity set forth below.

(Tr. 20-21).

Plaintiff contends the ALJ's credibility finding is not supported by the record as a whole

because the ALJ ignored the detailed headache log plaintiff kept contemporaneously with her

15

treatment with Dr. Martin at the Cincinnati Headache Institute at Drake Hospital. Plaintiff argues that this log is the most accurate and most credible indication of plaintiff's functioning during the relevant time period because it was made at Dr. Martin's instruction and for the purpose of medical treatment, and not for purposes of a disability claim which was not filed until some eight years later.

The Court agrees with plaintiff's assignment of error to the extent plaintiff's headache log coincides with her treatment with Dr. Martin. The ALJ's finding that "[t]he medical records for that time period show that her headaches were generally diminishing in severity in 1996 and 1997" is misleading and incomplete. The ALJ appears to premise his credibility finding on several notes in Dr. Martin's records showing plaintiff's favorable responses to various treatment modalities. (Tr. 20; Doc. 10 at 12). Yet, Dr. Martin's statements reflecting a favorable response to treatment cannot be taken in isolation, but must be examined in relation to the overall number, frequency, and severity of plaintiff's monthly headaches. A decrease in migraine headaches from six to two in a given month can certainly be characterized as an "improvement" in plaintiff's functioning, but says little about the ultimate issue of plaintiff's ability to work. As the VE testified, if plaintiff missed two or more days of work per month because of migraine headaches, she would be unemployable.

For example, in his decision, the ALJ stated Dr. Martin's exams through June 1996 showed plaintiff to be "somewhat improved in terms of the severity of her migraine headaches." (Tr. 20, citing Tr. 545). However, the ALJ failed to note that Dr. Martin in the same progress note also found plaintiff experienced "both tension type as well as sinogenic headaches which accompany these migraines leading to *daily headaches.*" (Tr. 545). Despite the relative

16

"improvement" in the severity of plaintiff's headaches noted that month, Dr. Martin nevertheless added Lo-Estrin and Tylenol #3 to plaintiff's medication regimen, increased the dosage of Desipramine, and continued Fiorinal. (Tr. 545). Thus, the ALJ's limited citation to Dr. Martin's notes says little about plaintiff's actual functioning.

Likewise, the ALJ cited to a December 1996 note where Dr. Martin reported that plaintiff was doing "reasonably well." (Tr. 20, citing Tr. 554). Again, the ALJ's recitation of the evidence is incomplete because Dr. Martin's records also show plaintiff was still experiencing four or five migraines per month (Tr. 554), over the limit identified by the VE as precluding gainful employment.

Finally, the ALJ cited to the October 1997 note where Dr. Martin[2] reported that plaintiff's migraines had "been doing reasonably well" and which the ALJ concluded was "consistent with monthly headache score sheets covering the time from March 1996 to September 1997." (Tr. 20, citing Tr. 567). While Dr. Martin's records do state plaintiff had "been doing reasonably well in the last month," he also reported that plaintiff nevertheless reported experiencing five migraine headaches per month as well as nasal symptoms and nausea. (Tr. 567). Again, the ALJ's citation to a note that plaintiff was "doing reasonably well" says little about plaintiff's ability to engage in sustained work activity for that time period given that she still experienced five migraine headaches per month.

More importantly, Dr. Martin's records are fully consistent with plaintiff's testimony of disabling headache pain for the relevant time period. A close reading of Dr. Martin's records in

---

[2]The ALJ's decision mistakenly identifies Dr. Jurrell, instead of Dr. Martin, as the author of this report. (Tr. 20). It is clear from the record that this note was authored by Dr. Martin. (Tr. 567).

conjunction with plaintiff's headache log reflects that plaintiff, at times, experienced a decrease in the severity or frequency of her migraine headaches for some months, while an increase in both severity and frequency during other months depending on her response to medications, diet, and other factors, as well as the impact of the other tension and sinus headaches. Nevertheless, because she still experienced at least two days of severe migraine headaches each month, she would be unable to perform sustained work activity because of the number of absences due to headaches. (Tr. 604). When Dr. Martin's records are read in tandem with plaintiff's contemporaneous headache log, which was kept by plaintiff pursuant to Dr. Martin's instructions for the purpose of medical treatment, his various comments that plaintiff was "improved" or "doing reasonably well" do not negate the evidence that plaintiff nevertheless still experienced at least two days of severe or very severe migraine headaches each month, with the exception of two months: March 1996 (4 days of severe or very severe headaches); April 1996 (9 days of severe or very severe headaches); May 1996 (15 days of severe or very severe headaches); June 1996 (6 days of severe or very severe headaches); July 1996 (2 days of severe headaches); August 1996 (10 days of severe or very severe headaches); September 1996 (5 days of severe or very severe headaches); October 1996 (3 days of severe or very severe headaches); November 1996 (7 days of severe or very severe headaches); December 1996 (3 days of severe or very severe headaches); January 1997 (6 days of severe or very severe headaches); February 1997 (0 days of severe or very severe headaches); March 1997 (1 day of severe headaches); April 1997 (7 days of severe headaches): May 1997 (4 days of severe headaches); June 1997 (5 days of severe headaches); September 1997 (6 days of severe or very severe headaches) (Tr. 474-489, 549). Thus, even if plaintiff experienced a decrease in the overall number of her headaches, she still

18

experienced two or more days per month of severe or very severe migraine headaches (with the exception of two to four months in 1997)[3] and would be disabled according to the VE.

Although the ALJ's credibility finding is entitled to deference, his explanation for discrediting plaintiff's testimony must be reasonable and supported by substantial evidence. *Jones v. Commissioner*, 336 F.3d 469, 476 (6th Cir. 2003). As explained above, and in contrast to the ALJ's basis for his credibility determination, the medical records do not show plaintiff's headaches "were generally diminishing in severity in 1996 and 1997." Dr. Martin's records are consistent with and support plaintiff's complaints of the existence and severity of her headache pain. For the time period of Dr. Martin's treatment, there is no medical evidence which conflicts with plaintiff's reports of the severity and frequency of migraine headache pain and there is no indication that Dr. Martin ever questioned the veracity of plaintiff's complaints of pain. The Commissioner cannot cite to snippets of Dr. Martin's records reporting plaintiff's headaches were "dramatically improved" or "doing reasonably well" (Doc. 10 at 12) without putting such remarks in the context of plaintiff's overall functioning for each month. Thus, the ALJ's basis for discounting plaintiff's credibility for the time of her treatment with Dr. Martin is not substantially supported by the record and his decision in this regard should be reversed.

In determining whether to reverse or remand this matter for further proceedings, the Court notes that the records for 1996 through 1997 support a finding of disability for at least a closed period. As the ALJ stated, however, there are no records of treatment from December 1997 (Tr. 568) to November 1998 (Tr. 119), two months after plaintiff's insured status lapsed. Nor did the ALJ assess plaintiff disability subsequent to her date last insured through the date of the ALJ's

---

[3]There is no log for the months of July and August of 1997.

decision. Therefore, this matter should be remanded for a determination of whether plaintiff is entitled to continuing disability benefits subsequent to December 1997, or for a closed period of disability.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner by **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 1/5/07

Timothy S. Hogan
United States Magistrate Judge

20

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LAURA COUCH,
  Plaintiff

vs                                                    Case No. 1:08-cv-300
                                                      (Beckwith, J.; Hogan, M.J.)

COMMISSIONER OF
SOCIAL SECURITY,
  Defendant

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).